May it please the Court, Your Honor. Robert Jacobus. I'm counsel for the appellant Medifast, Inc. and Shirley MacDonald as the administrator. Representative of the estate of Brad MacDonald with me at the counsel table is Lanie Cohen. And I'd like to reserve four minutes for rebuttal. Are you planning to divide the argument or not? No, we're not, Your Honor. Despite the voluminous record in this case, there are really just two points this case boils down to. First is the standard. It's undisputed that to overcome an anti-SLAPP statute, all that the plaintiff needs show is minimal merit of its allegations. The court's job is not to weigh the evidence. It's not to weigh credibility. It's not to compare the probative strengths. It's kind of like summary judgment. It's kind of like summary judgment. I didn't say summary judgment. Oh, I said kind of like summary judgment.  But you're looking at all the evidence that was produced. Correct. And asking whether that's enough to meet. And it all requires minimal merit to proceed. That's the first point. The second point is, and this is the dispositive question, this appeal, is whether the defendant's statements declare or imply that Medifast was an endless chain, like a pyramid scheme, or running its business like a Ponzi scheme. That's a dispositive question based upon what they published. Now, in the district court, we met our burden with respect to one specific claim, which was the endless chain in violation of California law. The district court got that right. As to Fitzpatrick. As to defendant Mr. Fitzpatrick. His unequivocal statement that Medifast violates the endless chain statute under California law was found by the court to be a provably false statement of fact. And that's because of the declaration of Dan Bell, which showed, picked apart Mr. Fitzpatrick's statements, picked apart the statute, and showed not just that we're not an endless chain, but we're not a pyramid and we're not a Ponzi scheme. Now, with respect to Mr. Fitzpatrick's statement, once the district court ruled that we prevail on that one statement, we get to go under OASIS with respect to all the other allegations, all the other accusations that Mr. Fitzpatrick made. That's point one. With the district court. But your claim just remains as to Mr. Fitzpatrick. Correct. Now, with respect to the other two defendants, Minko and Conan, this is where the district court got it wrong. First of all, by finding that Mr. Fitzpatrick's statement that we're an endless chain in violation of California law is liable per se because Mr. Conan, Ms. Conan and Mr. Minko republished those statements as a mere republisher, the case, the anti-slap motions of those two defendants should be dismissed. Before we get to that, let's just stay on Mr. Fitzpatrick if we could. Right. So I guess I read our decision in Yagman as saying the mere statement of someone's view that your client is in violation of California, whatever that statute is, the endless chain statute, that that's not going to be actionable if you lay out all of the facts on which you base that assertion. And then you are unable to show that any of the sort of underlying factual assertions are false or likely to be provably false. I didn't find Mr. Bell's affidavit or declaration that helpful because he never sort of laid out in chart-like form, here's the underlying factual statement, here's why that's wrong. I mean, are there a couple that you could just zero us in on that you think are particularly clear in that respect? I will, Your Honor. And let me preface the answer to the question by saying the fundamental point, the provably false assertion of fact that underlies Mr. Fitzpatrick's opinion is that METAFAST pays for recruiting. That's the fundamental thing. That's best line. Where does he say, and I've got his report right here, I look for this. If he had ever said that people get a piece, you know, the folks who recruit others get a piece of that $199 or whatever it is, that's a direct payment for bringing someone else into the company. Right. Then I would agree with you. But I don't – where did he ever say that? Where did Mr. Fitzpatrick ever say that? In his report. In his report. Well, his report concludes that it's an endless chain. No, no, no. But you're not answering Judge Watford's question. Yeah. Okay. Point me to – I got the report right here. Just show me where does he say that people who are bringing others in get a – get basically a chunk of that money that is paid for the initiation fee? Well, he doesn't say that specific statement. Okay. But what he does say, and this is Yodman, Your Honor, if he makes a statement and his conclusion by its design and operation operates like an endless chain in violation of 327, which is a very specific statement, if he makes that, and as his conclusion and his only defense to that statement is truth, you have to then look at the statute to say, okay – I look at the – I don't know what it means. That's what I'm saying. Someone can lay out the – here are the following five facts that I'm asserting are true. And based on that, I think they're in violation of the statute. They might be wrong. You can counter that with all sorts of speech that you want. But unless you can show that one of those five underlying facts is false, then you don't have a claim under Yakman. That's how I read Yakman. And that's why I'm asking you, show me in Fitzpatrick's report one of those five underlying factual statements that he's using to support the ultimate conclusion. Show me one that's just particularly clear that it's false. Well, and I can give you a record cycle on rebuttal where he does say that the emphasis on recruiting and people are – people are paid based upon bringing another mark into the scheme. People are – people are paid based upon bringing another participant in. And that's – Your Honor, that's what 327 is designed to prevent. Best Line and the Figurette case are very specific in terms of what they prevent under the statute. And the statute says if you're bringing someone in and they're paying for the right, okay, to get money by bringing another recruit in, that's what violates the statute. And Mr. Fitzpatrick, in his opposition, tortures that. The compensation as defined under the – under the Best Line case to say, well, they are paying compensation because when people come in, you know, they bring another help. I hear you. But I guess I'm just a little bit startled that you're not able to point me – just pick the most egregious, factually incorrect statement in the report. Just point it – point me to that statement and then show me exactly where in Bell's affidavit he refutes it. Okay. It seems like it should be very simple for you to do. Well, I can show you, first of all, in Bell's declaration, I could cite you specifically to the record where – where Bell refutes that we're an endless chain or a pyramid. I mean, I'm – That's the conclusion, though. Yeah. We're talking about the underlying fact. But the – so the conclusion is, if you make a statement, and again, it's a statement of criminal conduct. It's libel per se. It's what Yagman and Milkovich say, is that if you – is if you make that accusation but you lay out what you're basing it on, that the reader's going to look at it and say, okay, we know that this person is just attaching a conclusion to these facts, and so you've got to prove that the underlying facts are wrong. So that's why – that's why the questions are all focused on what are the underlying facts that are wrong and please show us where. Okay. On the underlying facts that are the base of this conclusion, I'll get you to cite, Your Honor, is that the health coaches that are recruiting, the health coach at the one that's recruited someone in always makes more – always makes less than the person that he recruited. That's one of Mr. Fitzpatrick's statements, that you bring someone in, okay, the money's being transferred upline, okay? So the person that recruits someone else comes in. The person that's selling the product is always making less – is always making less than the person above him. That's one of his specific statements, and Mr. Bell refuted that. The health coach making the sale, the one at the lowest end, is always making more than the person above him. Point me to the place in the report where he says that. I'll get you those cites, Your Honor. I mean, that's what this case is about, and I guess that's what is so frustrating for us. The way you've litigated this case is that you never link those together. You have all these paraphrases of what these guys supposedly said, and I'm asking you just give me one direct quote. Just point it to me and then point me to where in the Bell affidavit it shows that it's false, and I just – that's what I would have expected you to come prepared to oral argument to do. If you can get us the cites afterwards, that's great, but that's really, for me at least, the main sticking point I've got with your presentation. I will get to the cite, Your Honor. Let me move on to two other statements, though, because we're not just resting on endless chains and we're not resting upon republication. There are two other statements here, two statements that the district court did not address, allegation that we were operating as a pyramid scheme, which is similar to the endless chain, and the allegation that we're a Ponzi scheme, comparable to Bernie Madoff. Those are two other statements. Why is that just hyperbole? It's not hyperbole because of the circumstances under which it was made. The defendants, all three of the defendants, were engaged in a conspiracy, which started with short-selling the shares of Betafast. Both of the participants in that conspiracy, Ms. Conen and Mr. Fitzpatrick, were paid substantial money to write their reports. It's not as though they picked up these reports and started to publish this stuff on their own. They were paid so that Minkow could put profit by short-selling. And at the time, the report, as originally drafted by Mr. Fitzpatrick, was in September of 2008. Okay? The report was held. The report wasn't published until February 2009, after Mr. Madoff had pled to the biggest Ponzi scheme in the world. Now, that statement is, again, the fact that FDIC was launched with a specific statement saying, watch as Mr. Minkow compares the Take Shape for Life platform of Betafast to Madoff's Ponzi scheme, and then gave – and then just didn't say it's like a Ponzi scheme. Okay? He then went through and showed the classic hallmark of a Ponzi scheme, the fact that there's a money – it's a closed system, and that it's a money transfer game because there are insufficient sales coming in. So he gave – to your point, Your Honor – he gave the underlying facts, provably false statements of fact, that supported the assertion that this was a Ponzi scheme. And again, all of the three publications – we're talking about the now shuttered FDI website, which had an air, this was a fraud buster. This was a convicted felon, now turned fraud buster. His whole reputation was on uncovering fraud. Serious tone, serious content. No hyperbole. Same thing with Conan's fraud files. This was a serious publication. She's a forensic accountant. You go to Sequence Inc., and then you get fraud files where, again, they're uncovering corporate fraud. That's not hyperbole, Your Honor, with due respect. So that's the Ponzi scheme allegation. And the district court specifically addressed the Ponzi scheme allegation. And inexplicably, the court looked at that and said, well, even though the court said it would be – our job would be easy if the defendants had said, Medifast runs its business like a Ponzi scheme. And that would be liable, per se. Inexplicably, the court rejected that claim below. This Court has de novo review. This Court can and should reverse on the Ponzi scheme allegation. Maybe you could just address the Communications Decency Act immunity as to both – is it Conan? Conan. Conan and Minkow. Maybe you could do it separately. Yeah, I will, Your Honor. First of all, with respect to Mr. Minkow first. Mr. Minkow did not raise the CDA as an affirmative defense below. Did not – did not – It's not been the occasion for him to do that. The same way that – Are you saying he didn't argue it to the district court, or are you saying that he didn't file an answer that included that as an affirmative defense? Neither one, Your Honor. Okay. So that's waiver of the CDA as to Mr. Minkow. But – well, I don't know. I guess I have trouble with that because it seems to me it's your burden at the stage of the slap motion where we're at to show that you've got a probability of success. And if the defense comes in even at that point and says, well, they can say all they want, but I'm actually immune by virtue of this Federal statute, it seems to me you've got to make some showing at least that, no, actually they're wrong or – not definitively wrong, but at least that we're likely to be able to overcome them. Okay. Well, with respect to that, I mean, if – assuming there's no waiver found in Mr. Minkow, then he has no CDA immunity for the same reasons that Ms. Conan has no CDA immunity. They – they – I thought the statute basically said if all you do is republish someone else's words, you're not going to be liable for the defamatory content – containment. Is that – That's correct, Your Honor. But that's not what either one of those defendants did. It was – we're not resting on just the republication. In the case that – So same thing for Minkow and Conan. Point me to just – give me the specific statement beyond the republication of Fitzpatrick's report that you say is just flat-out false and then show me where in the bail affidavit he's done that. Okay. Let me go, first of all, to Ms. Conan's if we're speaking about her. And I'll cite to the record. It's ER 152, which is a September 2009 post from Ms. Conan. And she says at the top of her post, this is, MetaFast and Take Shape for Life Weight Loss Pyramid Scheme. Got it. I'm looking right at it. It's a question mark. Okay. So here are the false statements. If you look at the second paragraph, it says, There are no minimum purchases at MetaFast. That's a false statement. Okay. Then she makes a link in the second paragraph and brings in Mr. Minkow and then also talks in that paragraph about the company YTB, which got nailed,  But she says, Here's now going on simply the rest of the post. She says, this is at the second to last paragraph, Take Shape for Life, however, makes it clear that to make real money, you have to recruit new people into the plan. That's not true. Mr. Bell said you can do it by volume. You can make money. And he showed how executive director levels do make money just strictly on volume sales, retail sales, or you can build structure. So that's not a true statement. She says real money. What does that mean? Well, I don't know what that means. But the implication, well, When you responded to it, though, you didn't say real money. You just said make money. That's what Bell said. You can make money. Isn't there a difference between making money and making real money? Well, she addresses that in another post. There is a difference. I'll agree with you there's a difference. But her conclusion is this. It says, this is where the allegations of being a pyramid scheme come in. Like all the MLMs I've looked at, the product or service isn't the focus. That's not a true statement because the whole point of TSFL, the product, the coaching, is the focus of it. It's not recruiting. And Mr. Bell, again, in his declaration demonstrated that at the time they were writing this, over 80% of the sales were made to retail sales by existing health coaches. It wasn't based upon recruiting. And her next statement, it's simply the bait to get someone like this to make a company look legitimate. But then here's her conclusion, the rhetorical question at the beginning, her conclusion. Everything points to the real deal being endless chain recruitment into a pyramid scheme. That's her conclusion. That is what we're saying. That's the defamatory statement. That was before the district court. And let me give you the other site for Ms. Conant, which was ER 192. This one, again, this takes her out of the CDA. Her title says it all in this one. More on the endless chain recruitment scheme of Medifast and Take Shape for Life. And this is where she posts Mr. Fitzpatrick's report, and she says, here's from the report, here are the facts that basically prove that this is an endless chain. And then she goes through Mr. Fitzpatrick's report, and here are, just to your point earlier, Your Honor, actually this addresses your question about Mr. Fitzpatrick's statement. Ms. Conant says, in the words of Mr. Fitzpatrick, the paid plan pays for more per sale to those who recruit other coaches than to those who actually sell product to consumers. And the greatest share of all commissions is transferred to those in the top positions of the pyramid. That is a provably false statement by Ms. Conant republishing Mr. Fitzpatrick's report. That's the false statement that Mr. Fitzpatrick made in his report that I identified to Your Honor earlier. That's ER 192? On 192. And then ER 192, I was reading from ER 193, Your Honor. And I'm still on ER 193 for this point. This is the last, this goes to Your Honor's question about making real money versus making any money. It says, she quotes statistics from Mr. Fitzpatrick and then says, check that out. The bottom half of coaches only receive 6% of all the commissions the company pays. The above statistics are typical for MLMs. And then she says, unless you can get into the top tier of the pyramid, and almost no one does, you aren't going to make any money. That is a provably false statement of fact. So by taking Mr. Fitzpatrick's report, providing her own commentary, putting her own headlines on it, and coming to her own conclusion, which is similar to what Mr. Minkow did, that is, that takes them out of the CDA and makes them liable just as though they were publishing those reports. Okay. You're running low on time. How about Minkow? You've got independent committees. There's two, let me point you first of all to ER83. And that is, first of all, that's the announcement of the Metafraud website. Yeah. ER83? ER83. And again, that was republishing the report. Click it, there's a link on it, but it says, in the report, Mr. Fitzpatrick shows how the Take Care for Life division of MetaFast is nothing more than an endless chain pyramid scheme. Then if you look at How about ER88? Yes, ER88, that's the point of similarity between Madoff and MetaFast again. And here again, those are the statements I made earlier, Your Honor, about the comparisons to Madoff. But particularly, I mean, those same elements, closed system, no retail sales or insufficient sales, so therefore an emphasis on recruiting and people having to come in, and then paying for recruits to come in or people that come in have to buy an inventory load. That's best line. Those are the cases. That's what the court found, again, at this level, which is the minimal merit that we're required to show to prove falsity, to survive the anti-slap. That's what the court correctly held with respect to that statement. As I say, there's the other statements, which are pyramids and Ponzi that also show that these statements are provably false and we should have survived the slap motion with respect to voter defendants. Okay. You got about half a minute left. Okay. You want to reserve that? I'll reserve that. I'll reserve that, Your Honor. Thank you. If you could, when you come back up, with respect to Fitzpatrick's report, if there are specific statements that you could flag, that would be very helpful. Good morning, Your Honors. May it please the Court. I'm John Stevens, appearing on behalf of Robert Fitzpatrick, Perry Minkow, and Fraud Discovery Institute, Inc. The discussion we're having this morning, I think, is important. Can you divide time? Yes, and I am. I'm going to take up two-thirds of the time and leave one-third for counsel for Tracey Conan. But the one point I'd like to emphasize initially is that the discussion we're having this morning is a good discussion. This is an important discussion on an issue that is becoming increasingly controversial, about the use of these multilevel marketing schemes to promote and sell health products. But it's a discussion that shouldn't be happening in court. It should be in the marketplace of ideas. The main issue before the Court this morning is, how does California's anti-SLAPP law apply to per se libel allegations in a federal case? The first issue that the Court brought up this morning with opposing counsel was this question of the burden of proof. The burden of proof that was submitted to the Court or stated to the Court is a true statement as far as it goes. But in looking at the California anti-SLAPP statute, it's quite clear. It says that where there is a cause of action that arises out of a person's exercise and furtherance of their free speech, that cause of action will be stricken. And the cause of action will be stricken unless the plaintiff making that statement can establish that there's a probability that they're going to prevail on that claim. It is a probability of prevailing. It's not a summary judgment standard. It's summary judgment, as the cases say, in reverse. The burden remains on plaintiff to make that showing. And they not only have to make that showing in terms of what they can provide to the Court in terms of admissible evidence, they have to state valid claims. And they have to support those claims by sufficient admissible evidence that will support a judgment. It's not just minimal merit. It's not the Rule 8, as opposing counsel has indicated in his briefs, would support a defeat of an anti-SLAPP judgment. This is something that requires specific pleading, which wasn't done. And then beyond that, it requires evidence to establish the provability that the statements made were false. In this instance, we have dozens of statements that were made. The district court dispensed with the bulk of them simply by saying they weren't properly pled, and they weren't. They're either the California statutes or the standards or the Federal standards. These are claims that have to be specifically alleged, and they weren't. The district court looked at the evidence that was presented by METAFAST and concluded that there was no establishment by METAFAST that any of these statements were probable false, with the exception of one. And the one statement that the court focused on was this one made by Mr. Fitzpatrick. And what Mr. Fitzpatrick said is very important in terms of specifically what he said. And it wasn't just a statement out of context or out of the blue that happened to get published in a newspaper. He did a report. His report was based on his analysis of public information available from METAFAST itself. This was information that he gleaned from public disclosure statements. Information that he took from their website. Information that they were putting out in the world through their press releases, which are constant. Mr. Fitzpatrick did an analysis of all the information that he had, and it was all METAFAST information. And he concluded, based on his analysis of all of this, that this TSFL, the Take Shape for Life, which is the multi-level marketing arm of METAFAST, met the definition of an endless chain. That's what he said. And it was said in the context of his report. The district court found that this was a provably false statement. So Mr. Bell tried to throw holes in that. He did. And it was interesting what he did. He threw an awful lot into his declarations. And the more you read it, the more you realize that there's really not a lot there. But there's some things that are quite important. And they're important more by what he doesn't say than what he does say. The most important thing that I think he does say is that there are, as far as retail sales, they're at a percentage where they can't be deemed a pyramid. Under the California law, that doesn't matter. The Omnitrition case that the Ninth Circuit decided back in 1995 went through the analysis of the FTC standard for what a pyramid is and went through the California standard of what an endless chain is. But it was a summary judgment case, so they were simply looking at whether there was evidence that would go to trial. But they made the point that in terms of the FTC standard that there was much more involved. The FTC recognizes that. Mr. Fitzpatrick was not looking at the FTC definition of what a pyramid scheme is. But just so for purposes of our discussion we're clear as to what the distinctions are, the FTC pyramid says that to the extent that the participants receive rewards unrelated to a sale to a user, that could be a pyramid. You have to look at something outside a sale to a user. That has been problematic in application. Who's a user? What's a sale? If you sell to someone within the plan, is that a sale that would be part of a pyramid? Under California law, yes. And the Omnitrician Court suggested that when it said whatever might be meant under the FTC standard, that's prohibited by the California standard. But, again, that was on summary judgment. But the California statute is quite clear. It's in black and white. The FTC standard leaves all kinds of gray area, but that gray area is why we need people like Robert Fitzpatrick out there in the world saying, this is the way I interpret it, and these are the facts that I've relied on, and they're your facts. I didn't make these up. They're out of your information. Maybe not complete, because Mr. Bell tells us that he's giving us information that wasn't disclosed, that was proprietary before. So can we fault Mr. Fitzpatrick for that? But the California statute, by comparison, says an endless chain exists if payment is made for the chance, the chance, to receive compensation for introducing additional people. And the last section of the anti of the endless chain statute in California also makes the point that compensation does not include, it excludes, again, those elements of compensation that are derived from sales to non-participants. So it excludes that area, but it does not exclude the ability of people to maintain or to obtain compensation for sales within the system. Those are prohibited under California law. And that's what Mr. Fitzpatrick was talking about, not this much more difficult to apply FTC standard. But it's important that when the court looked at this, when the district court looked at this, she acknowledged the California endless chain statute, and she acknowledged the Best Line case, which is something counsel referred to and I'd like to get into in a minute. But what she said was that she adopted the notion that sales were not or compensation was not received merely for selling a product. Well, that doesn't answer the question. That's one of those half-truths again. The fact that sales and compensation is received for sales within the program for people who have been recruited within the program, that's where Medifast is running afoul of the California endless chain law. And it's interesting, people look at these facts and come to very different conclusions. That's, I think, the important thing to address here, is that people can look at these different facts and reach different conclusions. But Medifast, in its complaint, in its very complaint, states what is an endless chain. It says that people become health coaches by paying this initiation fee, which it calls a career builder pack. But it's still, it's a payment. Back in those days when Mr. Fitzpatrick wrote his report, it was $99 for the lesser level where you could get 15 percent, pay 20 percent, you get 190, pay 299, you get 20 percent. That in itself is compensation for something other than a sale. That is quid pro quo for paying an additional amount just to get that additional 5 percent commission. But what Medifast actually says in its complaint, which reveals the endless chain, is first you pay this to become a health coach. You pay this initiation fee, this career builder pack, and you pay a semi-annual renewal, which is clearly compensation for participating in this scheme. And then it goes on to say that health coaches receive commissions from sales to clients, non-participants, and coaches, participants. That gets them right there. They go on to say that the, they also get a residual commission by the sales made by the coaches they recruit. Clearly, this is compensation within the system that is, runs afoul of the endless chain statute. So let me get back to Mr. Bell's declaration. Why isn't it enough, like if this were summary judgment, to get this case to trial, this claim to trial? Because he has the obligation. Wrong with his declaration. Well, his declaration, for example, admits the endless chain. But, and he does that, again, by his comment, for example, at ER 1012, that retail sales are at a percent where it can't be deemed a pyramid. That doesn't do it. The fact that there are retail sales that are not at a percent, that it wouldn't be a pyramid, acknowledges in itself, and he states as well, that there is compensation being paid for non-retail sales. And that in itself runs afoul of the California endless chain law. But to get back to your point more specifically, Medifast has the burden. In this case, it was conceded that all of the statements made, all of these allegedly libelous statements, were done in the furtherance of the individual's rights of free speech. Burden has now shifted. Medifast now has the obligation to establish by admissible evidence that those statements were true.     And Medifast admits it didn't. And Medifast's testimony would be, the statements would be admissible, right? Yeah. But do they prove that the ---- That's what I'm asking. That's what my whole point was. Why don't they meet it? Why doesn't Bell, why don't Bell's statements meet the test? Because they don't establish that what Mr. Fitzpatrick said was false. All right. There we go. Mr. Fitzpatrick may have countered what Mr. Bell was saying with statements that were true. And that's the second category that we can go into. First issue is, did Medifast meet its burden? No, it didn't. And it admits it didn't, and Mr. Bell or Mr. Bell in his declaration says that it doesn't. Beyond that, there's this issue of, because you can't have a libelous statement if all the facts are on the table, under the Agman case, they again can't succeed on their claim. They failed their burden. They can't establish that the statement is provably false because Mr. Fitzpatrick has shown how it's true. And beyond that, we now have individuals with all of the facts laid on the table, and Mr. Fitzpatrick is giving you his interpretation. Anyone reading his report, and it has to be read in context, that's, you know, part of what we deal with in libel law as well, you have to read these things in context. Let me ask you ---- I'm sorry to take you away from Fitzpatrick, but your time is going to run short. For Mr. Minow, Minkoff, sorry, ER-88, so his comparison to Madoff. Right. So this, that first statement, recruiting fresh money, you know the part I'm talking about. Yes, I've got it in front of me. Yeah. Okay. So with funds from later coaches paying returns to earlier ones. That just strikes me as suggesting that, in fact, part of that initiation fee is going to the person who brought the new mark into the scheme. How else am I supposed to interpret that? And it sounds like you agree that that actually is not true. No. Well, I think that, you know, the money comes and goes in any business as it would in Medifast and any other business that's operating with income that has to be used to pay people commissions, for example. That money comes from someplace. But nobody is getting money. These new people who are being brought in, it's not money coming out of their pocket that's going to the person who recruited them. You agree with that, right? Well, the money is going, the money actually goes back up to Medifast, which then pays out the commission. So it goes up the chain. But the commission is paid on an actual sale. The commission is paid on an actual sale, but it also trickles upward. So it might be okay and not run afoul of California's. But this is just focusing on the statement. It says with funds from later coaches paying returns to earlier ones. Right. And as you go up. When does that happen? When a sale is made, the revenue from that runs up the chain. The money is paid. The product is provided. Those people might be participants and maybe not. Medifast admits that sometimes they are, sometimes not. But the revenue runs up the chain. And so even at the very base level of that, for the person that makes that sale, perhaps that would not be a violation of the Endless Chain Law. But as it funnels up the chain, it does become a violation of the Endless Chain Law. But the other point I'd like to make about this ER-88, because I'm running into it. Go ahead. We've got about a minute and a half. Okay. But the what they did with this document, which has been now attributed to Mr. Fitzpatrick, and he didn't do this document. Mr. Minkow admits that this is his work. That's who I was talking about. But you're representing him as well, right? And I do. And what Mr. But I wanted to make the distinction there because they now have both been accused in the reply brief of making a statement. It wasn't. It was Minkow. But what Minkow is saying is these are points of similarity. And what he's saying is true depending on the level you choose to look at. And what they're doing is simply making a comparison. This is not libel on its face. You couldn't determine in looking at this document whether this is libel per se because you need more information. And that's the real point here is that Medifast has failed its burden. What Mr. Minkow is saying is true, but beyond that, this is not libel per se. The one – I would like to address one more point on this. There's something else you'd like me to address with Mr. Minkow. Your co-counsel may be arguing with you at this point. Right. But I do want to make the point that this case does not have to go back down to the district court. Because all of the statements were deemed to be per se in furtherance of free speech, every single allegation of defamation was now the burden of Medifast. This does not go back to the district court because they happened to succeed on one. And the case in point is the Towles case where someone tried to fit dozens of allegations of invasion of privacy and free speech into a single cause of action and addressed it to multiple people. And this, again, is a California Supreme Court case, a little before the case that counsel referred to. But in that case, the judges agreed, no, you do have to go back, plaintiff, and establish the provability of falseness as to each claim because the burden was shifted to you. Thank you. Okay. Good morning, Your Honors. I have abbreviated time, so I'll try to make my comments quick. I obviously represent the appellees Tracy Conin and Sequin Zink. My name is Heather Roseng, and I'm here with my colleague, Leah Plaskin. I would submit, too, that this isn't even a close call as to Tracy Conin. This is indeed a First Amendment case, and we want people doing exactly what Ms. Conin does, which is to critically look at corporate America and blog about it. And that's what she does. If you take a look at her blogs, there are 70 of them. Was she paid for doing this? She was paid. By MNCO. Right. Not for the blogs, per se. How much did she get paid? I think overall, Your Honor, around $50,000. $50,000? I think so. How is that calculated? But that is not only related to this case. How is that calculated? You know, Your Honor, I don't know. That's not in the evidentiary record. Right. But it's not only for this case. She assisted Mr. MNCO with, you know, a variety of different projects over the years. There's an unsavory character in this, though. Right? Well, there, yeah. Just the fact that she got paid by this guy $50,000 to do this, it doesn't cast your client in a real positive light. I just want to be clear. $50,000 is what she was paid, I believe, overall. I believe that's what she testified to, not specifically with regard to this in particular. She worked on other projects for him. Other projects for him, too. And I don't know the breakdown, and it's not part of this particular record, to my recollection. But what she's doing is she's blogging, Your Honors. And if you take a look at her blog, you know, the seven postings that she made, it's really interesting because she invites commentary. People are allowed to come on those blogs and say, hey, I disagree with you, or I agree with you. And then she can respond to it. It's open, honest dialogue. I think it's an important part of this. So Plaintiff's Counsel said that she added some things, though, to what Mr. Fitzpatrick had said. That is true. If you look at her blogs, and it's very, very difficult to respond to Medifast's allegations because they say one thing in the First Amendment complaint. Their anti-SLAPP opposition and argument mentioned completely different statements that they brought up in the appeal and that they mentioned today. Did she add something to what Mr. Fitzpatrick said? She did. There is, if you look at her seven postings, the vast majority of it is republication, clearly and unambiguously protected by the CDA. She definitely has some of her own opinion in there, but it's clear it's opinion, and that's what I'd like to spend a couple of minutes on. A couple of minutes is all that I have. I do want to point out that many of the inflammatory statements stated by Medifast, both in their papers and today in oral argument, have absolutely no relationship to Ms. Conin's blogs. For example, the district court found that Ms. Conin, as well as her co-defendants, were alleged of running a Madoff-sized Ponzi scheme, violating Federal securities laws and defrauding its investors, running an illegal pyramid scheme in violation of a California criminal statute, poisoning health coaches, and using the services of a Madoff-like accountant firm to cover up. You read her seven posts, Your Honors, you will not find the words Madoff, Ponzi, Federal securities laws, defrauding, illegal, or cover-up anywhere in there. Their re-characterizations of Ms. Conin's statements are egregious, misleading, is a kind word to be used in this particular context. But what about her statement that in order to make real money, you have to recruit new people into the plan? And that's her opinion, Your Honor, and I think it's an opinion that's well-based on the facts, but opinions, as you know, are non-actionable. And I think this is the most important thing that I really have to say. If you look at the Morningstar case in particular, the California Supreme Court, it talks about how you can recognize an opinion, and you have to read the whole thing in context. And the Morningstar case says that if you have loose, figurative, and hyperbolic speech, things like real money, cash cow, MLM junk, all words used by Ms. Conin in her blogs, that you know that it's her expressing her opinion as opposed to a report or a news article. And I'll give you the best proof of this. Mr. Giacobas, when you asked him what does real money mean, he says he doesn't know. Right. But then he went on to quote another statement where he quoted Ms. Conin as saying you aren't going to make any money unless you get to the top of the chain. Yeah. Does she say that? And isn't that something different from an opinion, if she thinks? A quote about any money is not anywhere in this appeal, Your Honor. I heard him read that. I didn't catch the record. C.R. 192 to 193. Yeah, 192, 193, I think. I got it written down, and we're going to go and look at it. So maybe you could address that? Absolutely. I would have to go back and take a look at the record. Maybe you should. Okay. Maybe you should grab that page and take a look at it and tell us what you think about it, because we're going to go do that. Yeah, absolutely, Your Honor. I would just point out, though. Right now. Absolutely. The eight statements mentioned in their appeal, that isn't one of them. So I just want to let you know this is brand new, literally brand new. It's not in their appeal at all. But I have 13 seconds. Would you like me to go look at the record? You have it there. Okay. I'll reserve my 13 seconds for the end then. It's right there. She's got it right there. I just don't happen to have that page in front of me. 192 and 193 is what the city was reading from. Okay. You can take a look at it. I'm sorry? You can take a look at it. Thank you. It's just very difficult, because, again, this isn't in their appellate papers. It's literally not in there. Which statement? It was something about you aren't going to make any money unless blah, blah, blah. And you'll have to make recruit? Yeah. I don't see that. You have to recruit people into the scheme in order to have any chance to make a living? I'm sorry. Which paragraph are you reading from, Your Honor? I don't have it in front of me. That's the problem. Yeah. I'm reading from the second paragraph. Well, January 13th is mainly a republication of the thing. The Fitzpatrick New Report, the January 2010 report. Yeah. They make so little money from selling, and that's true. If you take a look at the statistics, which we cited in the record, and I'll give you the specific cite to the record, the SER337, and the Metafast Disclosure Statement discloses the bottom 80% makes $78 to $388 a year. The top .63% makes $16,000 to $41,000 a year. The bottom line is this is a situation where you can recruit people 10 levels down. You can recruit people 10 levels down, and it's a situation where the money from the sale of products flows back up, and the people at the top are the people who make the money. That's not even disputed by Mr. Bell's declaration. It's the way that this works. And I just would like to reiterate that the information that was available to Ms. Conin, to Mr. Fitzpatrick, to Mr. Minkow, all of them at the time that they made these publications, which are distinct, you need to separate out these three defendants, but it was based on the data that Metafast made available at that time. Mr. Bell later came forward only in the context of this litigation and executed a big declaration, but it was the first time that these people had ever heard of it in opposition to our anti-SLAPP motion. So I'm not really sure what my time is anymore. Do I actually have two minutes and 46 seconds? Any other questions? You're over your time now. Oh, okay. Yeah, that's okay. Well, I just urge you to read these posts, Your Honor, because I think you'll clearly find that they are statements of opinion and opinions that we want there out in the marketplace under our First Amendment. So thank you very much for your time. Thank you. I'll give you a minute for rebuttal. For you. I reserved four, Your Honor. No, you only have one. I only have one? That's it. Well, let me just address then very quickly with respect to Bell's report, Bell's declaration. As Your Honor said, Bell's declaration is enough. It supplies the ---- No, we can say it's a matter of law. It's not enough. But if you look at Best Line and you look at the other cases, those are jury trials, Your Honor. And as counsel said, there are facts on both sides, and this Court's job is not to weigh comparative evidence. No, I mean, you don't have to weigh it. I mean, you can just look at it. And, Your Honor, I believe ---- And say that it's insufficient to show that any of the statements in Fitzpatrick's report are false. Right. Or that he's hiding information. Okay. And speaking of the ---- and I agree with you. And speaking of Fitzpatrick's report, Your Honor, I want to correct a statement by counsel for Mr. Fitzpatrick. ER 88, which at the points of similarity between Metafast and Madoff, the one that makes that provably false statement of fact about the recruiting fresh money in the closed system, that statement was written by Mr. Fitzpatrick, and that is ER 932 to 934. He wrote that for Mr. Minkow. That's one of the things he got paid to do. And since we're speaking of the First Amendment, I just have to end with a Milkovich quote, which is basically that, yes, there's the First Amendment, but society has a pervasive and strong interest in preventing and redressing attacks upon reputation. This was a paid attack upon the reputation of Metafast. And, Your Honor, one last point in terms of Judge Watford. Your question about what is the statement that Mr. Fitzpatrick made, I can't give you the record site as I sit here. I respectfully request a letter to the panel identifying in the record site. But the statement, the provably false statement of fact that's in this 30-page report that he wrote, is the statement that Ms. Conant republished, which is on ER 193. It says, The pay plan pays far more per sale to those who recruit other coaches than to those who actually sell products to consumers, and the greatest share of all commissions is transferred to those in the top positions of the pyramid. Both of those statements are provably false. Bell's declaration said so. And that is Mr. Fitzpatrick's words as republished by Ms. Conant. I will get you, Your Honor, the record site for Mr. Fitzpatrick from his report for that statement. Okay. Thank you, counsel. We appreciate your arguments by all counsel. It's a very interesting case. And, you know, safe travels back to New York, I believe. And elsewhere.
judges: Kennelly, Paez, Watford